UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Case No. 14-04545-FPC7 |
| JUSTIN McCAFFERTY and AUTUMN McCAFFERTY, | **NOT FOR PUBLICATION** |
| Debtors. | |
| AUTUMN I. McCAFFERTY, | |
| Plaintiff, | Adversary No. 15-80015-FPC |
| vs. | MEMORANDUM DECISION |
| UNITED STATES DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

## **INTRODUCTION**

Autumn and Justin McCafferty filed a chapter 7 bankruptcy petition in December 2014 seeking to discharge their consumer debt. The discharge was granted on April 15, 2015. On March 24, 2015, Autumn McCafferty commenced

MEMORANDUM DECISION ~ Page 1

this adversary proceeding seeking an undue hardship discharge of her student loan obligations pursuant to 11 U.S.C. § 523(a)(8). Defendants, the United States Department of Education ("DOE") and Educational Credit Management Corporation ("ECMC"), filed answers denying that Mrs. McCafferty satisfies the test for undue hardship. A one-day trial was held on September 23, 2015. Mrs. McCafferty, pro se, appeared and testified. Defendant ECMC was represented by Daniel J. Bugbee and Defendant DOE was represented by Vanessa R. Waldref. Defendants called to testify Justin McCafferty, (Plaintiff's husband) and Philippe Guillon, loan analyst. Plaintiff's exhibits B-E and K and Defendants' exhibits 2, 8-12 and 14 were admitted into evidence without objection. This matter is ready for decision.

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b). This is a core proceeding to determine dischargeability of a particular debt under 28 U.S.C. § 157(b)(2)(I). This memorandum decision includes the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 (applying Fed. R. Civ. P. 52 in adversary proceedings). For the reasons set forth below, an order shall be entered denying Autumn McCafferty an undue hardship discharge pursuant to 11 U.S.C. § 523(a)(8) of her student loan debt.

## FACTUAL BACKGROUND

Mrs. McCafferty is a healthy thirty-three-year-old female who lives in an apartment in Pullman, Washington, with her husband and thirteen-year-old daughter.

Mrs. McCafferty began her postsecondary education in 2000 at Spokane Community College. From 2000-2014, she attended various institutions and obtained a cosmetology license, a cosmetology instructor license, and an A.S. degree in office administration. Mrs. McCafferty is currently working toward obtaining a B.A. in accounting.[1]

During the same time frame, Mrs. McCafferty's employment history varied from unemployed to working full-time.[2] Currently, Mrs. McCafferty is employed by DABCO Property Management, earning $15 per hour and $22.50 per hour for overtime. Her position is full-time during the month of December and the months May through August. During the rest of the year, her position is part-time at twenty hours per week. Because of staffing changes, Mrs. McCafferty worked over-time hours in June, July, and August of 2015. She did not anticipate that the over-time would continue. However, Mrs. McCafferty is hopeful that her position will become full-time year-round and that she will receive a pay increase within the next couple

---

[1] The parties stipulated to the following summary of Mrs. McCafferty's postsecondary education: 2000-2001, Spokane Community College (cosmetology program, no degree obtained); 2001-2002, Mr. Leon's School of Hair Design (no degree obtained); 2004-2006, Spokane Falls Community College (A.S. in office administration); 2008-2009, Mr. Leon's School of Hair Design (cosmetology and instructor cosmetology license); and 2011-2014, Western Governor's University, (pursuing a B.A. in accounting).

[2] The following summarizes Mrs. McCafferty's work history as stipulated by the parties: 2002-2004 (unemployed); April 2005-October 2008, administrative assistant (full-time at $12.77/hour); August 2009-April 2011, cosmetologist (full-time at $90/day); and April 2011-June 2014 (unemployed).

MEMORANDUM DECISION ~ Page 3

of months (after her one-year review). During times of unemployment,

Mrs. McCafferty regularly sent out resumes and diligently sought employment.

Mr. McCafferty worked as a car salesman at Chipman & Taylor Chevrolet from 2003-2015. Mr. McCafferty voluntarily left that position in March, 2015 to start his own lawn-care company, Level 5 Lawn Care Services. The decision to leave the car dealership was based on Mr. McCafferty's family's best interest. Despite long hours and diligence at Chipman & Taylor Chevrolet, a down-turn in the economy had severely affected car sales and he had four months of zero-sum paychecks. Therefore, Mr. McCafferty justifiably decided to put his hard work and energy into a different business.

During discover, Mrs. McCafferty submitted gross income information for the last seven years. From the evidence presented, the McCaffertys' income was highest in 2008 (approximately $82,000) and steadily declined until 2011, where it has remained fairly steady averaging approximately $55,000.[3] Both Mr. and Mrs. McCafferty testified that it was their goal to maximize their income and hoped that with the new business and the possibility that Mrs. McCafferty's position would become full-time year-round, that their yearly income would at least stay at its current level and hopefully increase. Given the variability in the hours

---

[3] Both parties stipulated to the adjusted gross income as indicated on the McCaffertys' previous federal income tax returns: 2008 (AGI $82,096); 2009 (AGI $74,350); 2010 (AGI $66,493); 2011 (AGI $53,594); 2012 (AGI $55,923); 2013 (AGI $49,230); and 2014 (AGI $55,075).

MEMORANDUM DECISION ~ Page 4

Mrs. McCafferty currently works, and the fact that Mr. McCafferty recently started the new business, it is difficult to establish an accurate and fixed net monthly income amount. However, evidence presented demonstrates that the McCaffertys' net monthly income is currently $3,726.00 per month.

At issue in this case are Mrs. McCafferty's multiple student loans. It is not disputed that Mrs. McCafferty primarily financed her postsecondary education with loans and currently has outstanding loans with both the DOE and ECMC. Mrs. McCafferty received her first educational loan disbursement in 2001 and her last in 2013. The interest rates on the loans vary from 2.3% to 6.6%. The combined amount owing on both the DOE and ECMC loans is approximately $73,000.00, which includes the principal, accrued interest, and fees. Mrs. McCafferty has never made a payment on her DOE loans and has paid about $1,000 toward her ECMC loans.

As to her student loans, Mrs. McCafferty testified that (1) in the past she was unable to pay any amount toward her student loans, (2) she currently remains unable to pay, and (3) she does not foresee any change in the future as to her ability to make payments on her student loans. According to Mrs. McCafferty, paying any amount toward her student loans would be an undue hardship. Defendants disagree. Defendants argue that Mrs. McCafferty incurred significant student loan debt, and

now, having paid almost nothing on that debt, seeks to discharge it all despite being young, healthy, and employable.

All parties agree that flexible repayment options remain available to Mrs. McCafferty under the William D. Ford Program ("Direct Loan Program").[4] At trial, the defendants attested that an Income Based Repayment ("IBR") plan with a payment of approximately $315.00 per month is currently available to Mrs. McCafferty. This IBR plan includes all principal, interest and fees of both Mrs. McCafferty's DOE and ECMC loans. In order to enroll in the IBR plan, Mrs. McCafferty merely needs to indicate her approval to the defendants.

## LEGAL ANALYSIS

The purpose of bankruptcy is to give good-faith debtors a fresh start. *Little v. Reaves* (*In re Reaves*), 285 F.3d 1152, 1157 (9th Cir. 2002). In tension with this overall purpose, educational loans are presumptively non-dischargeable in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Thus, to obtain a discharge, a debtor must demonstrate that she meets the "undue hardship" requirement of § 523(a)(8).

---

[4] The William D. Ford Program is found at 34 C.F.R. § 685.100, et seq.

**I.** ***Brunner* Test**

To determine what constitutes undue hardship under 11 U.S.C. § 523(a)(8)(B), the Ninth Circuit, along with many other circuits, has adopted a three-part test first enunciated in *In re Brunner.*[5] *See United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108, 1114 (9th Cir. 1998) ("We adopt the *Brunner* test as the test to be applied to determine the 'undue hardship' required to discharge student loans in bankruptcy pursuant to 11 U.S.C. § 523(a)(8)(B)."). Under the *Brunner* test, to discharge a student loan debt, the debtor must prove that: (1) she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if required to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) the debtor has made good faith efforts to repay the loans. *Educ. Credit Mgmt. Corp. v. Mason* (*In re Mason*), 464 F.3d 878, 882 (9th Cir. 2006); *Brunner*, 831 F.2d at 396.[6] The debtor bears the burden of proving all three elements by a preponderance of the evidence in order to obtain a discharge of an educational debt. *Rifino v. United States* (*In re Rifino*), 245

---

[5]  *In re Brunner*, 46 B.R. 752 (S.D.N.Y. 1985), *aff'd sub nom., Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987) (three-prong undue hardship test first enunciated).

[6]  The *Brunner* test has come under increasing criticism. Others have noted that the *Brunner* test "is too narrow, no longer reflects reality, and should be revised." *In re Roth*, 490 B.R. 908, 920 (B.A.P. 9th Cir. 2013) (Pappas, J., concurring). However, until revised, it is binding law and the test this court must follow.

MEMORANDUM DECISION ~ Page 7

F.3d 1083, 1087-88 (9th Cir. 2001). "If the debtor fails to satisfy any one of these requirements, 'the bankruptcy court's inquiry must end there, with a finding of no dischargeability.'" *Id*. at 1088 (quoting *In re Faish*, 72 F.3d 298, 306 (3d Cir.1995)).

In this case, Mrs. McCafferty satisfies the first two prongs of the *Brunner* test. However, she fails to satisfy prong three because she has not shown that she made a good faith effort to repay her student loans.

### a.   Whether Mrs. McCafferty can maintain a "minimal" standard of living if forced to repay the loan

The initial prong of the undue hardship analysis under *Brunner* requires the debtor to show a present inability to maintain a minimal standard of living if forced to repay her student loan. *Rifino*, 245 F.3d at 1088. Although the standard to obtain a discharge of student loans is high, it is not unattainable. *See Pa. Higher Educ. Assistance Agency v. Birrane* (*In re Birrane*), 287 B.R. 490, 495 (B.A.P. 9th Cir. 2002). "[C]ourts require more than temporary financial adversity, but typically stop short of utter hopelessness." *Id*. (quoting *In re Nascimento*, 241 B.R. 440, 445 (B.A.P. 9th Cir. 1999)). Thus, this element of the undue hardship analysis compares the individual's standard of living against her current income and expenses. *See cf*., *Rifino*, 245 F.3d at 1088 (finding this element satisfied if the debtor proves she could not maintain a minimal standard of living based on her current income and expenses); *Pena,* 155 F.3d at 1112-13 (subtracted debtor's average monthly

1  expenses from net monthly income to determine whether first prong of *Brunner* test

2  was met).

3      The McCaffertys' monthly net income is $3,726.00 per month.

4  Mrs. McCafferty testified that her family's monthly expenses totaled approximately

5  $3,700 per month. The defendants do not contest the fact that the McCaffertys incur

6  the specified expenses. Rather, the defendants argue that many of the expenses are

7  not reasonably necessary to achieve a minimal standard of living.[7] As evidenced by

---

[7]  The following table indicates each party's estimation of the McCaffertys' monthly expenses necessary to maintain a "minimal" standard of living as noted in their respective trial briefs.

| Monthly Expenses | Plaintiff | Defendants |
|---|---|---|
| Rent | $685 | $685 |
| Telephone | $250 | $90 |
| Electricity | $150 | $125 |
| Internet Service | $52 | $52 |
| Automobile Payments | $530 | $531 |
| Automobile Maintenance | $75 | $50 |
| Automobile Fuel | $300 | $150 |
| Automobile Insurance | $94 | $94 |
| Life Insurance | $44 | $0 |
| Dependent Allowance & Savings | $40 | $0 |
| Groceries | $675 | $600 |
| Clothing | $50 | $50 |
| Orthodontist | $235 | $235 |
| Geidel Clinic Fees (Plaintiff & daughter) | $80 | $80 |
| Prescriptions | $20 | $20 |
| Anytime Fitness Gym Membership | $70 | $0 |
| Netflix Subscription | $17 | $0 |
| Hulu Subscription | $8 | $0 |
| Ipsy Subscription | $10 | $0 |
| Focus on the Family Subscription | $15 | $0 |
| Church Offering | $150 | $0 |

MEMORANDUM DECISION ~ Page 9

the expense table, the parties dispute the necessity of monthly expenses totaling approximately $900 per month. Of that disputed amount, approximately $300 relates to expenses that the McCaffertys designate as tithes to their church or other church-sponsored donations. The McCaffetys' tithes/charitable church contributions include a $150.00 per month church offering, a $100.00 per month missionary sponsorship, and a $50.00 per month sponsorship of a child through World Vision.

Resolving the dispute over the McCaffertys' budget, "is a matter properly left to the discretion of the bankruptcy court." *Pena*, 155 F.3d at 1112. This court employs common sense, knowledge gained from ordinary observations in daily life, and general experience when determining whether someone's expenses are unnecessary or unreasonable, whether someone is paying for something that is not needed, or whether someone is paying too much for something that is needed. This court agrees that "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *Ivory v. United States Dep't of Educ. (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001). Additionally, in a previous case, this court rejected Defendant ECMC's

| Missionary Sponsorship Donation | $100 | $0 |
| World Vision: Sponsored Child | $50 | $0 |
| Total | $3,700 | $2,762 |

assertion that a debtor eligible to participate in an IBR plan could never show undue

hardship under prong one. ECMC's argument impermissibly substituted an

administrative formula for a bankruptcy judge's discretion.[8] This court found that

following such an argument would "render an absurd result" that would be

"inconsistent with the *Brunner* analysis." *Morrison v. Sallie Mae, Inc. (In re*

*Morrison)*, No. 13-00933-FPC7, 2014 WL 739838 at *4 (Bankr. E.D. Wash.

Feb. 26, 2014). Similarly, this court concludes that the Defendants' argument that

tithing can never be an allowable expense under the § 523(a)(8) analysis is an

attempt to usurp a bankruptcy judge's discretion.

### i.    Tithing and § 523(a)(8)

Defendants argue that the McCaffertys' tithing and charitable giving expenses

are not allowable expenses under a § 523(a)(8) undue hardship analysis and contend

that the monthly donated amounts should be considered available to pay on the

student loans. The court is not convinced.[9] The question is whether the passage of

the Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No.

---

[8]  As other courts have commented, "some officials of the Ford Program are compassionless number-crunchers and that determinations as to how much a debtor can afford to pay are much better left to the courts." *Nys* v. *Cal. Student Aid Comm'n (In re Nys)*, No. 02-11455, 2003 WL 22888941 at *1 (Bankr. N.D. Cal. Aug. 11, 2003).

[9]  The parties did not cite, nor has the court been able to locate, any binding authority concerning whether charitable contributions should be considered in undue hardship determinations.

MEMORANDUM DECISION ~ Page 11

105-183, 112 Stat. 517 (1998) ("RLCDPA") impacts this court's § 523(a)(8) undue

hardship analysis.

The RLCDPA amended several sections of the Bankruptcy Code to exclude

charitable contributions of up to fifteen percent of the debtor's adjusted gross

income ("AGI") from consideration by the bankruptcy courts.

> For example, Congress amended Section 707(b) to make clear that
> the bankruptcy court should not consider a debtor's modest
> charitable contributions in determining whether to dismiss a Chapter
> 7 case for "substantial abuse." 11 U.S.C. § 707(b). Congress also
> amended Sections 544(b) and 548(a) to insulate such charitable gifts
> from avoidance by a trustee as fraudulent conveyances. 11 U.S.C.
> §§ 544(b)(2), 548(a)(2), 548(d)(2)(4). Congress also declared that
> charitable contributions should not be considered "disposable
> income" by the bankruptcy court in determining the amount of
> required payments by a debtor to creditors under a Chapter 13 plan.
> 11 U.S.C. § 1325(b)(2)(A).

*Ritchie v. Northwest Educ. Loan Assn. (In re Ritchie)*, 254 B.R. 913, 920 (Bankr. D.

Idaho 2000). Notably however, the RLCDPA made no amendments to § 523(a)(8).

Courts have interpreted this omission as Congressional intent to alternatively create

(1) a per se prohibition of charitable giving as an allowable expense under the

§ 523(a)(8); (2) a per se allowable expense of charitable giving (not to exceed 15%

of a debtor's gross annual income); or (3) no impact on the § 523(a)(8) analysis.

### (1)  Per Se Prohibition

Courts construing the omission of a change to § 523(a)(8) under the RLCDPA

as acting as a per se exclusion of charitable giving as an allowable expense rely on

the rule of statutory interpretation stating that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Ritchie*, 254 B.R. at 919 (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997)). Following this statutory interpretation, some courts concluded that because Congress chose not to amend § 523(a)(8), the negative implication must be that Congress *intended to prevent* debtors from including tithing as a permissible expense when calculating income available for student loan repayment. *See*, *e.g*., *Ritchie*, 254 B.R. at 919-21. However, this analysis fails to take into account that RLCDPA was passed primarily to protect churches from being sued by bankruptcy trustees attempting to recover tithes previously made by debtors. *See* H.R. Rep. No. 105-556, at 2-3 (1998). Given this purpose, "Congress would have little reason to make changes to § 523(a)(8) when it deals only with whether or not a student loan should be discharged and never allows a retroactive reach back into a church's coffers. Therefore, the omission of a tithe protection in § 523(a)(8) should not be construed as Congressional intent to always exclude tithes as an expense under the undue hardship analysis but rather that Congress simply paid no mind to § 523(a)(8) when it passed the RLCDPA."

MEMORANDUM DECISION ~ Page 13

*McLaney v. Ky. Higher Educ. Assistance Authority (In re McLaney*, 375 B.R. 666, 681 (M.D. Ala. 2007).[10]

### (2)    Per Se Allowable

Courts that have concluded that tithes are a permissible expense when conducting a § 523(a)(8) undue hardship analysis rely on the rule of statutory construction instructing that provisions in one act which are omitted in another on the same subject matter should be applied when the purposes of the two acts are consistent. *See cf. Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani)*, 311 B.R. 496, 503-04 (Bankr. N.D. Ill. 2004) ("conclud[ing] that a bankruptcy judge should not override a debtor's commitment to tithing"); *In re Cavanagh*, 242 B.R. 707 (Bankr. D. Mont. 2000), *aff'd*, 250 B.R. 107 (B.A.P. 9th Cir. 2000) (finding charitable contributions to the extent not exceeding 15% are reasonable). Such courts concluded that because (1) a determination of disposable income is a component of all the bankruptcy sections and (2) the RLCDPA creates a presumption that bona fide charitable giving (up to 15% of debtor's AGI) will be protected, that (3) the § 523(a)(8) analysis should also permit similar contributions.

---

[10]   It seems even courts that indicate tithing is not a permissible expense, may allow de minimis tithing. *See cf.*, *Ritchie*, 254 B.R. at 919 ("question presented is whether Congress intended that debtors seeking to discharge student loans be able to make *significant* charitable donations") (emphasis added); *Fulbright v. United States Dep't of Educ. (In re Fulbright)*, 319 B.R. 650, 659 (Bankr. D. Mont. 2005) (noting debtor's monthly tithe was "*not* de minimis, or modest and reasonable under the circumstances, and . . . is a *significant* charitable donation . . . and is per se unreasonable when not required for membership") (emphasis added).

MEMORANDUM DECISION ~ Page 14

*See*, e.*g.*, *Lebovits v. Chase Manhattan Bank (In re Lebovits)*, 223 B.R. 265 (Bankr.

E.D.N.Y. 1998) (tithing was permissible expense under § 523(a)(8)); *Meling v.*

*United States* (*In re Meling*), 263 B.R. 275 (Bankr. N.D. Iowa 2001) (monthly tithes

of $100 were reasonable for purposes of § 523(a)(8)). However, it is not so clear that

the purpose of the Code sections changed by the RLCDPA and § 523(a)(8) are

similar enough to presume charitable donation protection.

### (3)    No change

Indeed, this court is hesitant to automatically sweep the § 523(a)(8) hardship

analysis under the RLCDPA protections. Rather, this court agrees with the *Fulbright*

court in that it does "*not view* the subject matter of § 523(a)(8) . . . as the same

subject matter or purpose as the subject matter and purposes of § 548(a)(2) (recovery

of fraudulent transfers), § 707(b) (dismissal for substantial abuse if Chapter 7), and

§ 1325(b) (confirmation of a Chapter 13 plan)." *Fulbright v. United States Dep't of*

*Educ. (In re Fulbright)*, 319 B.R. 650, 660 (Bankr. D. Mont. 2005) (emphasis

added). This court finds the First Circuit accurately explained why the purpose of the

bankruptcy sections amended by the RLCDPA are simply too different from

§ 523(a)(8) to be considered "consistent" with each other. *Educ. Credit Mgmt. Corp.*

*v. Savage* (*In re Savage*), 311 B.R. 835 (B.A.P. 1st Cir. 2004). When explaining, the

*Savage* court stated:

> In undue hardship analysis, most courts employ the same model
> as is used to determine "disposable income" for Chapter 13 plan

MEMORANDUM DECISION ~ Page 15

confirmation purposes. Although the problems are similar (ascertaining whether there are sufficient resources to fund payments), the objects (disposable income for plan confirmations vs. payment without undue hardship) differ. Under § 1325, a debtor is generally not required to alter reasonable lifestyle choices. The same can be said of § 707(b) analysis, which generally focuses on the availability of sufficient disposable income to fund a Chapter 13 plan.

Under § 523(a)(8), the debtor's lifestyle (particularly expenses) is subjected to more rigid scrutiny. Courts differ on the degree of scrutiny applied, or, more precisely, on how much hardship a debtor can be expected to bear before it becomes "undue." But deference to a debtor's lifestyle choices is, to put it kindly, muted. Eliminating some expenses that would be considered legitimate under § 1325 might well be done without creating "undue" hardship.

*Savage*, 311 B.R. at 840 n.7 (citations omitted). Because of the differences in the Code sections, it would be inappropriate to automatically transfer the RLCDPA's charitable safe harbor to the § 523(a)(8) hardship analysis.

This court echoes the other courts that have noted that the RLCDPA made no changes to § 523(a)(8). Therefore, any interpretation that expressly allows or disallows tithing should be rejected as both interpretations seem to effectively amend § 523(a)(8) when Congress did not. *See Pa. Dep't Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990) ("We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure."). Rather, having thoroughly reviewed relevant authority, this court finds the last interpretation most convincing: RLCDPA's passage does not impact

MEMORANDUM DECISION ~ Page 16

the analysis of whether tithing should be considered a reasonable and necessary expense under § 523(a)(8). *See*, e.*g.*, *Educ. Credit Mgmt. Corp. v. Rhodes*, 464 B.R. 918 (W.D. Wash. 2012) (finding religious or charitable contributions not per se reasonable or unreasonable). Therefore, this court will continue to consider charitable giving expenses on a case-by-case basis, considering factors such as the amount and the debtor's history in order to determine whether, for that particular debtor, tithing constitutes a reasonably necessary expenditure. "[I]f bankrupt families are allowed to indulge a family pet or watch . . . cable television [then] surely a bona fide tithe to their church may at least be considered as a proper expense." *McLaney*, 375 B.R. at 682. In this case, the McCaffertys are deeply religious with a long history of monthly tithing. Therefore, tithing expenses up to $150 per month would be reasonable.[11]

### ii. Other expenses

Additionally, defendants challenge the following expenses:  the McCaffertys' cell phone expense ($250), monthly vehicle fuel ($300), daughter's allowance ($40), groceries ($675), clothing ($50), orthodontist ($235), Geidel Clinic Fees ($80), prescriptions ($20), fitness gym membership ($70), Netflix ($17), Hulu ($8), and

---

[11]   The court would have concluded that Mrs. McCafferty's tithing budget, to the extent that it exceeded $150.00, could be used to pay on her student debt. However, at this rate, the principal would never be repaid. Therefore, if Mrs. McCafferty had satisfied all three *Brunner* prongs, the court would have, as allowed in the Ninth Circuit, entered an order discharging some, but not all, of her student loan debt. *See In re Saxman*, 325 F.3d 1168 (9th Cir. 2003).

MEMORANDUM DECISION ~ Page 17

Ipsy subscription ($10). Defendants argue that many of these expenses are discretionary and can be eliminated altogether, while other expenses are merely excessive.[12] The calculation of cost reductions are factual in nature and, as such, "is a matter properly left to the discretion of the bankruptcy court." *Pena*, 155 F.3d at 1112; *Educ. Credit Mgmt. Corp. v. Jorgensen (In re Jorgensen)*, 479 B.R. 79, 68 (B.A.P. 9th Cir. 2012). Evidence presented demonstrates that the McCaffertys do not live an extravagant life style. They do not own a home. Both of their vehicles are approximately ten years old. They do not take expensive vacations. *See In re Cline*, 248 B.R. 347 (B.A.P. 8th Cir. 2000) (explaining not necessary to review debtors' budgets line-by-line to wring out all possible surplus where the expenses are minimal). Therefore, the court concludes that the listed expenses do not include any significant items that are not reasonably necessary to maintain a minimal standard of living. Indeed, their listed expenses fail to include many items that are arguably "necessary" for even a minimal lifestyle—including health insurance for Mr. McCafferty. Except to the extent that Mrs. McCafferty's tithing budget exceeds $150.00 per month, the remaining expenses are reasonable and necessary to maintain a minimal standard of living. [13]

---

[12]   *See supra* expense table note 7.

[13]   *See Hedlund v. Educ. Res. Inst. Inc.*, 718 F.3d 848, 855 (9th Cir. 2013) (finding the bankruptcy court's determination of allowable expenses not clearly erroneous); *Rifino*, 245 F.3d at 1087 (affirming the bankruptcy court's determination that debtor's standard of living would fall below a minimal level if she were required to repay her student loans even though debtor's budget included

1

**b. Whether additional circumstances exist indicating that**
**Mrs. McCafferty's state of affairs is likely to persist**

2

3       Under *Brunner*'s second prong, Mrs. McCafferty must prove "that her present

4   inability to pay will likely persist throughout a substantial portion of the loan's

5   repayment period." *Educ. Credit Mgmt. Corp. v. Nys* (*In re Nys*), 446 F.3d 938, 945

6   (9th Cir. 2006) (citing *Pena*, 155 F.3d at 1114). The Ninth Circuit explained that

7   bankruptcy courts should endeavor to identify whether "additional circumstances"

8   exist to support this finding, but clarified that "the determinative question is whether

9   the debtor's inability to pay will, given all we know about the salient features of her

10  existence, persist throughout a substantial portion of the loan's repayment." *Id*. at

11  946. Importantly, the second prong does not require the debtor "show exceptional

12  circumstances beyond the inability to pay in the present and a likely inability to pay

13  in the future. *Nys,* 446 F.3d at 947.[14]

14

15

16   tanning, cable television, and new car payments); *Birrane*, 287 B.R. at 496 (rejecting creditor's argument that bankruptcy court's finding regarding minimal standard of living was erroneous even
17   though debtor's budget included: "extraneous expenses related to debtor's dance company, charitable contributions, dining out expenses, and book club purchases and gifts," noting that
18   "whether to decline a discharge due to expenses which may be beyond the minimal standard of living is discretionary with the court.").

19   [14]   *See also Educ. Credit Mgmt. Corp. v. Mandighomi* (*In re Mandighomi*), 242 F. App'x 401, 404 (9th Cir. 2007) (internal quotation omitted) ("affirm[ing] the bankruptcy court's conclusion that
20   [debtor's] dim earnings forecast, children's needs, age, and size of debt make it such that his inability to make payments will likely persist throughout a substantial portion of the loan's repayment period.").

MEMORANDUM DECISION ~ Page 19

In *Nys*, the Ninth Circuit indicated that courts may refer to the following non-exhaustive list of possible "additional circumstances" which may prevent a debtor from having the ability to pay in the future. *Nys,* 446 F.3d at 946-47.

> Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; (2) The debtor's obligations to care for dependents; (3) Lack of, or severely limited education; (4) Poor quality of education; (5) Lack of usable or marketable job skills; (6) Underemployment; (7) Maximized income potential in the chosen educational field, and no other more lucrative job skills; (8) Limited number of years remaining in the debtor's work life to allow payment of the loan; (9) Age or other factors that prevent retraining or relocation as a means for payment of the loan; (10) Lack of assets, whether or not exempt, which could be used to pay the loan; (11) Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income; (12) Lack of better financial options elsewhere.

*Nys,* 446 F.3d at 947.

In this case, Mrs. McCafferty is thirty-three-years-old with no physical or mental limitations. However, the McCaffertys have very limited savings and minimal assets. Mrs. McCafferty's marketable skills are limited. Thus, it is unlikely that Mrs. McCafferty could obtain significantly better employment prospects or chances for more lucrative earnings. Additionally, Mr. McCafferty's business is physically demanding and weather dependent. Therefore, the new business (while not an unwise decision), will not likely lead to substantial changes in the

MEMORANDUM DECISION ~ Page 20

McCaffertys' current income. The court finds Mrs. McCafferty sustained her burden as to prong two.

### c. Whether Mrs. McCafferty has made good faith efforts to repay the debt

The third and final prong of the Brunner test requires the debtor to prove that she made good faith efforts to repay the loans or show that the forces preventing repayment are truly beyond her control. *Brunner*, 46 B.R. at 755. The final prong of the *Brunner* test requires that the debtor exhibit good faith in her efforts to repay the student loans. *Mason*, 464 F.3d at 884; *Pena*, 155 F.3d at 1114; *Rifino*, 245 F.3d at 1087.[15] Although, "a history of making or not making payments is, by itself, not dispositive," *Mason*, 464 F.3d at 884, it is a persuasive factor in determining whether a debtor has made a good faith effort to repay her loans. *Pena*, 155 F.3d at 1114.

Significant to this court's analysis of prong three is that despite maximizing her income and minimizing her expenses, Mrs. McCafferty has made minimal payments on her student loans in the last fourteen years. Mrs. McCafferty testified

---

[15] "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." *Hedlund v. Educ. Res. Inst. Inc*., 718 F.3d 848, 852 (9th Cir. 2013) (quoting *In re Birrane*, 287 B.R. at 499). In this case, the McCaffertys have likely maximized their income and minimized their expenses. There is no evidence that either Mr. or Mrs. McCafferty have purposely sought lower-paying jobs. Mrs. McCafferty, in addition to being currently employed, is actively involved in her daughter's education and assists with her husband's new business. Although Mr. McCafferty voluntarily chose to leave his position as a car salesman, the court found his testimony as to the reasons why he left to be credible and not unreasonable.

MEMORANDUM DECISION ~ Page 21

that she has made no voluntary payments on her DOE debt at any time and she has only paid approximately one thousand dollars toward her ECMC loans. Further, Mrs. McCafferty testified that when she had the financial ability to pay down debt, she has always chose to make payments on debts other than her educational loans. Unfortunately, a lack of any meaningful payment by debtors weighs heavily against finding of good faith. *See contra England v. United States (In re England),* 264 B.R. 38, 48 (Bankr. D. Idaho 2001) (finding no lack of good faith even though debtor had failed to make payments because debtor did not have the financial wherewithal to make payments). Mrs. McCafferty's decision to focus on other debt first "makes perfect sense if one ultimately pays off all one's debts. However, in a bankruptcy context, the court simply cannot conclude that paying non-student loan debt while not paying student loan debt constitutes a good faith effort to repay student loan debt." *Fuller v. United States Dep't of Educ. (In re Fuller)*, 296 B.R. 813, 819 (Bankr. N.D. Cal. 2003).

Also relevant to the good faith analysis and the facts at hand, is a "debtor's effort-or lack thereof-to negotiate a repayment plan." *Mason*, 464 F.3d at 884 (internal quotation marks and citations omitted). Some courts have found the debtor's unwillingness to do so to be a significant factor in the good faith analysis. *Birrane*, 287 B.R. at 500 ("Good faith is also measured by a debtor's effort-or lack thereof-to negotiate a repayment plan."); *United States Dep't of Educ. v. Wallace (In*

*re Wallace)*, 259 B.R. 170, 184 (C.D. Cal. 2000) ("A debtor's good faith can be measured by evaluating how he responded to repayment opportunities that were presented to him.").

Mrs. McCafferty testified that prior to the filing of this adversary proceeding, she had not attempted to negotiate a repayment plan with either lender. Defendants indicated that had Mrs. McCafferty investigated, at least four different income contingent repayment plans were available. Although this court makes no finding as to the prudence of the repayment plans available to Mrs. McCafferty, the court finds it relevant that Mrs. McCafferty failed to even investigate. *See, e.g., Mason*, 464 F.3d at (finding debtor's failure to diligently pursue "renegotiation of his debt under the ICRP" demonstrated lack of good faith); *Educ. Credit Mgmt. Corp. v. DeGroot*, 339 B.R. 201, 339 B.R. 201 (D. Or. 2006) (finding failure on part of Chapter 7 debtor to even apply for income-contingent repayment program was failure to make "good faith" effort to repay her student loan debt); *Fulbright*, 319 B.R. at 663 (finding no discharge for debtor who declined repeated offers by student loan creditor to allow him to participate in income-contingent repayment program).[16] Given Mrs. McCafferty's lack of payments and lack of diligence in pursuing

---

[16] Debtor in *Fulbright* argued that he refused the repayment plans because he disputed the amount the creditor indicated was due and owing. *Fulbright*, 319 B.R. at 663. However, the debtor failed to come forward with any evidence contradicting creditor's calculation of amount owed. *Id.*

MEMORANDUM DECISION ~ Page 23

1  repayment options, the court finds Mrs. McCafferty failed to satisfy her burden

2  under prong three.

3                              **<u>CONCLUSION</u>**

4      Mrs. McCafferty failed to satisfy the third prong of the *Brunner* test, therefore

5  her student loan debt is not dischargeable under 11 U.S.C. § 523(a)(8).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20